UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIMINAL NO. 15-CR-49 (06) (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT HANAD MUSSE'S** |
| | ) | **INDIVIDUAL POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| HANAD MUSTAFE MUSSE, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

The defendant, Hanad Mustafe Musse, by and through his undersigned counsel, respectfully submits this position paper pursuant to Rule 83.10(e) of the Local Rules of the United States District Court for the District of Minnesota. This position paper is presented in support of Mr. Musse's Motion for Downward Departure, Dkt. No. 700, and his Motion for Downward Variance, Dkt. No. 701. Mr. Musse also relies on a Joint Defense Sentencing Memorandum to be filed with the Court.

The Eighth Circuit has articulated a three-step sentencing procedure. *United States v. John H. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006). The Court is to first determine the sentencing guideline range, second consider whether a departure is warranted under the guidelines, and third consider the factors enumerated in 18 U.S.C. § 3553(a) and determine the proper sentence based on the facts of the case. *Id.*

Procedurally, Mr. Musse notes that he persists in his two objections to the preliminary presentence report. These objections are discussed in the addendum to the

final presentence report at pages A.1 and A.2. First, while Mr. Musse agrees the statutory

maximum term of supervised release is life, he contends the guideline range is not

enhanced to life because his actions did not create a **foreseeable** risk of death or serious

bodily injury to another. Mr. Musse agrees with the presentence report's conclusion –

that if the Court agrees the enhancement does not apply, the guideline range is 1-3 years

with the possibility of a departure or variance from that range. Second, Mr. Musse

maintains his objection to the conclusion in Mr. Koehler's report that Mr. Musse is "high

risk." Mr. Musse does not object to the inclusion of Mr. Koehler's report in the

presentence report and does not object to the Court considering Mr. Koehler's report with

whatever weight the Court deems proper.

Regardless of the status of those objections, Mr. Musse respectfully requests a

sentence of 72 months, which he contends is appropriate when balancing the severity of

the offense with the powerful mitigating factors present and his unique personal

circumstances.[1]

## SUMMARY OF ARGUMENT

The statutory range and the guidelines sentence range are not disputed. There is no

statutory minimum, and there is a statutory maximum of 180 months. (PSR ¶ 197.)

Because the terrorism enhancement applies, the PSR correctly notes the guidelines

offense level is 35 and the criminal history category is VI. (PSR ¶¶ 156, 158, 170.) The

---

[1] As explained below, at § 3.B.IV, a 72-month sentence would be at the midpoint of two
of the most similarly situated prior terrorism defendants, Shannon Conley (48 months)
and Muhammad Dakhlalla (96 months).

guidelines sentencing range – before the Court considers a downward departure or variance – is set to the statutory maximum of 180 months. (PSR ¶ 198.)

The terrorism enhancement reflects the common-sense observation that the offense of conviction is serious and the generalized belief that terrorism defendants present a high risk of recidivism. But Mr. Musse submits that, as to him, notwithstanding these generalities, a downward departure and variance are appropriate. In this case, a 180-month sentence (as contemplated by the terrorism enhancement) would violate the statutory mandate that the sentence not be "greater than necessary."

Mr. Musse has moved for a downward departure under two grounds. First, he argues that a departure to criminal history category I is warranted under USSG § 3A1.4(b) because criminal history category VI substantially overstates the seriousness of his criminal history and his likelihood of recidivism. (See PSR ¶ 214.) Criminal history category I is appropriate because, until this case, Mr. Musse had never been in trouble with the law in any way. Second, Mr. Musse moves for a downward departure under USSG § 5H1.1 for his unusually young age for a federal offender – he is 19 years younger than the average person incarcerated in the federal system.

More critical are the unusual mitigating factors present in this case which strongly indicate a downward variance is appropriate under § 3553(a). Mr. Musse is a dedicated son and brother who had a strong support structure. He was a good student and was on his way to being a productive adult. But Hanad's transition into adulthood was difficult, and he began searching for an identity and a sense of belonging. At this time, he fell into the clutches of ISIS, a powerful organization focused on targeting people just like him –

3

young, vulnerable Americans – to advance their own agenda and build a "caliphate." But

Mr. Musse is still young and he can get back on the path to being a well-adjusted member

of American society. A 72-month sentence would balance these competing factors and

would therefore be "sufficient but not greater than necessary" to effectuate the purposes

of sentencing considered in § 3553(a).

## ARGUMENT

I.      **A downward departure under USSG § 3A1.4(b) is warranted because Criminal History Category VI substantially overrepresents both the seriousness of Mr. Musse's criminal history and his likelihood to reoffend.**

Defendant Musse does not object to the presentence report's conclusion that he is

deemed to be in criminal history category VI under USSG § 3A1.4(b). (PSR ¶ 169.)

Nevertheless, Mr. Musse contends a downward departure is appropriate under §

4A1.3(b)(1) as "reliable information indicates that the defendant's criminal history

category substantially over-represents the seriousness of the defendant's criminal history

or the likelihood that the defendant will commit other crimes." USSG § 4A1.3(b)(1).

While the guidelines prohibit a downward departure under § 4A1.3 for armed

career criminals as well as repeat and dangerous sex offenders, no such prohibition exists

for defendants with § 3A1.4(b) enhancements. Multiple courts have acknowledged that a

§ 4A1.3 departure is *not* precluded by the terrorism enhancement. *United States v.

Benkahla*, 501 F. Supp. 2d 748, 758-59 (E.D.Va. 2007) ("Since a court retains discretion

to depart under § 4A1.3 despite the application of § 3A1.4, the Court will now consider

whether a departure is appropriate."); *United States v. Meskini*, 319 F.3d 88, 92 (2d. Cir.

2003) ("[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of

4

defendant's past criminal conduct or the likelihood that defendant will commit other

crimes' always has the discretion under § 4A1.3 to depart downward in sentencing.")

The criminal history category is meant to reflect what a defendant has done in the

*past*, notwithstanding the present offense of conviction, and to reflect the simple truth

that defendants with a longer and more severe criminal history deserve higher sentences:

> A defendant with a record of prior criminal behavior is more culpable than
> a first offender and thus deserving of greater punishment. General
> deterrence of criminal conduct dictates that a clear message be sent to
> society that repeated criminal behavior will aggravate the need for
> punishment with each recurrence. To protect the public from further crimes
> of the particular defendant, the likelihood of recidivism and future criminal
> behavior must be considered. Repeated criminal behavior is an indicator of
> a limited likelihood of successful rehabilitation.

USSG, Chapter 4 – Criminal History and Criminal Livelihood, Part A – Criminal

History, *Introductory Commentary*. Hanad Musse is a young man who, aside from the

offense at issue, has never been involved with the criminal system in any way. To ignore

his spotless criminal history would be to reject the highly individualized and

discretionary inquiry that is crucial to sentencing. *See United States v. Pepper*, 562 U.S.

467, 487-88 (2011); *See also Benkhala*, 501 F. Supp. 2d at 759, n.8:

> After applying § 3A1.4, Defendant's criminal history is maximized at
> category VI. For an individual with no criminal record and no evidence of
> ever having committed an illegal act in his life outside of the conduct for
> which he is convicted, this clearly over-represents the seriousness of his
> criminal history. [ . . .] Defendant's criminal history of VI also over-
> represents the likelihood that Defendant will commit other crimes. [. . .]
> The Court realizes that this analysis in this section is somewhat short.
> However, in light of the complete absence of criminal history, there is very
> little to discuss as to whether a category VI over-represents the seriousness
> of his criminal history.

II.    **A downward departure under USSG § 5H1.1 is warranted as concerns based on age, individually and in combination with other offender characteristics, are present to an unusual degree.**

Mr. Musse is unusually young for a federal defendant. He was just 18 years old when the alleged offense began and just 19 when arrested. (PSR p. F.2; ¶¶ 22, 23, 127). The guidelines consider age to be a relevant basis for departure where "considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.1. Consideration based on Mr. Musse's age meet this exacting criterion.

Recently, both jurists and neuroscientists have discussed the physical brain maturation process. Judge Bright's recent dissent in *United States v. Webster* – disagreeing with the majority opinion that the sentence was substantively reasonable – is instructive:

> Further, Webster was 20–years–old at the time of the offense. Since 2005, the Supreme Court, has consistently held young people are most likely to change during a period of incarceration. [. . .] In fact, psychological research indicates the human brain does not reach its ultimate stage of development until adolescents reach their mid-twenties. [. . .] Thus, young people like Webster are the most likely to reform while in prison. *Cf. Miller*, 132 S.Ct. at 2464, 183 L.Ed.2d 407 (noting that *Roper* and *Graham* established that juveniles have "greater prospects for reform" and, therefore, "'are less deserving of the most severe punishments'") (quoting *Graham v. Florida*, 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)).

*United States v. Webster*, 820 F.3d 944, 949 (8th Cir. 2016) (Bright, J., dissenting) (some citations and quotations omitted). The Supreme Court has discussed the difficulty in sentencing young defendants, noting "youth is more than a chronological fact. It is a time

6

and condition of life when a person may be most susceptible to influence and to psychological damage[.]" *Gall v. United States,* 552 U.S. 38, 58 (2007) (quotation and citation omitted). The Supreme Court focused particularly on juvenile sentencing in *Roper v. Simons,* 543 U.S. 551 (2005) and *Graham v. Florida,* 560 U.S. 48 (2010). Although Mr. Musse is legally an adult rather than a "juvenile," the same scientific analysis applies:

> The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." [. . .] The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson, supra,* at 368, 113 S.Ct. 2658; see also Steinberg & Scott 1014 ("For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood").

*Roper,* 543 U.S. at 570 (citations omitted). The *Graham* Court agreed:

> No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults.

560 U.S. at 68-69 (citations omitted).

Neuroscience generally supports the conclusion that Mr. Musse was biologically

and behaviorally immature when he committed the crime. *See, e.g., Mariam Arain et. al.*,

Maturation of the Adolescent Brain, Neuropsychiatr. Dis. Treat. 2013; 9: 449–461:[2]

> [A]dolescence may extend well beyond the teenage years. In fact, there are
> characteristic developmental changes that almost all adolescents experience
> during their transition from childhood to adulthood. It is well established
> that the brain undergoes a "rewiring" process that is not complete until
> approximately 25 years of age. This discovery has enhanced our basic
> understanding regarding adolescent brain maturation and it has provided
> support for behaviors experienced in late adolescence and early adulthood.
> Several investigators consider the age span 10–24 years as adolescence [. .
> .] Behavioral control requires a great involvement of cognitive and
> executive functions. These functions are localized in the prefrontal cortex,
> which matures independent of puberty and continues to evolve up until 24
> years of age.

*Id. See also* Sara B. Johnson, Ph.D., M.P.H, et. al., *Adolescent Maturity and the Brain:*

*The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*,

Published in final edited form as: J. Adolesc. Health. 2009 Sep; 45(3): 216–221.

("Longitudinal neuroimaging studies demonstrate that the adolescent brain continues to

mature well into the 20s. This has prompted intense interest in linking neuromaturation to

maturity of judgment.").[3]

For Mr. Musse, his developing brain is doubly important to his sentence in this

case. Not only does it (as the *Graham* court discussed, 560 U.S. at 68-69) render him less

hardened and more generally open to rehabilitation than a typical federal inmate, it also

helps us understand why he acted the way he did in this case. An immature brain is more

susceptible to outside influence. Although Mr. Musse is not without blame, he was

---

[2] available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/
[3] available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/

preyed upon by a sophisticated terror organization that targets immature young men for

exactly this reason. (*See* Transcript of Sep. 20, 2016 evidentiary hearing, testimony of

Daniel Koehler, 0:15-cr-49, Dkt. No.s 661-662 (hereinafter Koehler T.) at 77:25-79:3.)

(Noting ISIS's prime targets are Westerners between the ages of about 16 and 25, and

discussing the physical and psychological reasons for that targeting).

According to the Sentencing Commission, in March 2016, the average age of

incarcerated federal offenders was 40 years old. *Quick Facts: Federal Offenders in

Prison – March 2016*, USSC.[4] In this respect, as in certain others, Mr. Musse is

distinguished, to an unusual degree, from typical offenders. A downward departure is

therefore warranted. Should the Court find Mr. Musse's age-related considerations are

not sufficiently unusual to warrant a downward departure, Mr. Musse respectfully

requests the Court consider a downward variance on the same grounds.

**III.    Downward variance. 18 U.S.C. § 3553(a).**

In exercising its sentencing discretion, the Court is tasked with considering the

factors articulated in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for
>> the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most
>> effective manner[.]

---

[4] available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick-Facts_BOP_March2016.pdf

*Id.*; *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Barron*, 557 F.3d 866, 868 (8th Cir. 2009). The statute gives the courts the specific directive to impose a sentence which is "sufficient, but not greater than necessary" to reflect the concerns in § 3553(a)(2). Put another way, the Court should impose the minimum sentence which will accomplish the goals articulated in the statute.

While the guidelines should be considered in every case, and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives[,]" sentencing courts can and should vary from them based on the individual factors of the case. *Rita v. United States*, 127 S.Ct. 2456, 2464-65 (2007); *Id.* at 2473 (2007) (Stevens, J., and Ginsburg, J., concurring); *see also Booker v. United States*, 543 U.S. 220 (2005).

This position paper will discuss the § 3553(a) factors in two groups; first discussing the crime generally, then Mr. Musse specifically.

**A.    A sentence of 6 years is sufficient to respect the severity and seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.**

This is a severe offense. ISIS is a terrible organization and there is general agreement the government should heavily discourage all Americans from supporting it and other similar organizations. All involved have rightly taken this offense seriously. The § 3553(a) factors support the imposition of a significant sentence. But they do not require the imposition of the statutory maximum – a 72-month sentence is significant and would substantially exceed the average federal sentence imposed, which is between 40

10

and 45 months. *United States Sentencing Commission: Quarterly Data Report*, USSC, 3rd Quarter Release through June 30, 2016 at p.28.[5]

Further, a 72-month sentence will vindicate the deterrence-related considerations present in the statute. In *Gall v. United States*, the Supreme Court emphasized that even a sentence of probation is a serious punishment which imposes substantial restrictions on a person's liberty – and custodial sentences are much more severe than probationary sentences. 552 U.S. 38, 48 (2007). Here, a custodial sentence of 72 months will show everyone that Mr. Musse committed a serious crime and was severely punished for it. It will promote respect for the law and it will show all – in particular other young people – that conspiring to join ISIS will lead to a harsh punishment.

In *United States v. Conley* (discussed further below at § III.B.4) the attorneys for both the government and the defense discussed the substantial deterrence a 48-month sentence would have on other would-be travelers. From the government attorney: "she didn't simply just make statements. She set about to – to effectuate those things, and as we told her, it's a crime, and we were forced to arrest her, and it's an important deterrent message to send, to give her a sentence of 48 months, to let others know[…]" 1:14-cr-163, Dkt. No. 81, at p.30. From the defense: "[t]he people who are deterred, who have the potential to be deterred are the ones like Shannon Conley. Are the ones who will look up and they will see what this has done to her. They will know that she spent time in jail; that a Court has clamped down on her and controlled her; that it -- that it changed her

---

[5] available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_16_Final.pdf.pdf.

entire life" *Id.* at p.91. The Court agreed and imposed a sentence of 48 months with one

stated reason of that sentence being that he had "to send a message, that deters others."

*Id.* at p.105.

**B. A sentence of 6 years is sufficient, but not greater than necessary, when considering the "individual factors" – the nature and circumstances of the offense, the history and characteristics of the defendant, the need to provide the defendant with needed training or correctional treatment, and the need to avoid unwarranted sentencing disparities.**

In any sentencing, the most important inquiries focus on the individual person

being sentenced. "It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every case as a

unique study in the human failings that sometimes mitigate, sometimes magnify, the

crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). A

meticulous examination of Mr. Musse's individual characteristics reveals a number of

strong mitigating factors. A downward variance is appropriate.

### 1) ISIS's recruitment of Mr. Musse

As an examination of the presentence report shows, Mr. Musse has a genuinely

positive character. He is, at his core, a peaceful, social, and law-abiding person. He has

never acted violently toward anyone. The person before this Court is the same person

who went to live with his mother when she got cancer and in doing so uprooted his life at

the beginning of high school. (PSR ¶ 178.) During his mother's treatment, he provided

support for her while taking care of his five half-brothers and half-sisters. He even moved

to Kenya, where he had lived briefly when younger. (PSR ¶¶ 177-79.) He later moved to

Texas, and ultimately back to Minnesota, in order to further himself by pursuing higher

education. (PSR ¶ 179.) Given these, how did Mr. Musse become convinced that trying

to travel to Syria to join ISIS was the right thing to do?

ISIS, then and now, recruits young westerners very aggressively and with clever,

insidious means. They target vulnerable groups, such as young mothers. *See, e.g.*, Video

Report – Catherine Herridge, *ISIS targets young mothers to groom 'jihadi babies'*, FOX

NEWS.[6] ISIS also targets those living in diaspora communities, "knowing that individuals

in these communities are struggling to find their identity.  These organizations present

vulnerable individuals with an alternative identity, one that will make them feel important

and give them a purpose in life." Richardson, Matthew.  *Al-Shabaab's American*

*Recruits:  A Comparative Analysis of Two Radicalization Pathways*. M.A. Thesis,

University of Texas at El Paso, 2012, at p. 76. *See also* Koehler T. at 74:10-75:10

(agreeing that people with identity issues or low self-confidence are one potential target

group for ISIS).

Somalian-American children are prominent targets of ISIS's prolific propaganda.

They grow up with one foot in Somali culture and one foot in Western culture, with

neither culture seeming to have a strong affinity with the other. This balancing act is

difficult for young people who "may get caught (or lost) between the values of the

majority culture and those of their parents." Kapteijns, Lidwien and Arman, Abukar,

*Educating Immigrant Youth in the United States: An Exploration of the Somali Case*,

BILDHAAN: AN INTERNATIONAL JOURNAL OF SOMALI STUDIES: Vol. 4, Article 6. (2008)

---

[6] available at video.insider.foxnews.com/v/3969322707001/isis-targets-young-mothers-
to-groom-jihadi-babies/#sp=show-clips

at p. 23. Conversely, Somali parents often worry about "losing their children to [what they see as] a consumerist and individualistic American culture." *Id*. at p. 32. This drives young Somali people away from both Somali culture and mainstream Western culture. "Individuals who do not identify with any cultural group are particularly vulnerable to radicalization because they are searching for somewhere to belong." Richardson, *supra*, at p. 14 (citing Mirella L. Stroink, *Processed and Preconditions Underlying Terrorism in Second-Generation Immigrants,* Peace and Conflict: 13 J. PEACE PSYCH. 3 (2007) at 301-302).

Unfortunately, ISIS found Mr. Musse while he was searching for this sense of belonging. Through his life in Minnesota, Boston, Texas, and Kenya, he, like many young men, was searching for identity. He felt partially like an outsider in all of those places. In America, he felt like a Somali that did not belong. In Kenya, he felt like an American that did not belong.

ISIS's insidious propaganda captivated Mr. Musse as he was doing research for a school project. (*See* Mr. Musse's letter to the Court attached as Exhibit "A".) His initial understanding of ISIS was that it was made up of "a bunch of freedom fighters" or "holy fighters who are there to free the people from oppression and that they only fight people who are evil[.]" (Change of plea transcript, 15-cr-49, Dkt. No. 609 (hereinafter Plea T.) at 23:3-7; 37:4-6.) In his words, "Starting from the beginning, the reasons why I wanted to go to Syria was to help the oppressed people of Syria from the tyrant that controls the Syrian government, which is Bashar al-Assad, and I wanted to fight against his forces to free the Syrian people from their oppression that they face today." (Plea T. 34:17-22.) He

grew attached to the idea of "travel[ing] to Syria to fight for ISIL [and] to protect the people of Syria and Iraq and to form an Islamic state." (Plea T.23:14-17.) ISIS distributed their propaganda through the internet and through other people. (Plea T. 36:21-37:2.) He and the others watched videos produced by ISIS and interacted with ISIS members on social media. (PSR ¶¶ 73-84.)

As time moved on, Mr. Musse became more aware of ISIS's horrific humanitarian atrocities. Yet he was already psychologically close to the organization at that point. (Plea T. 23:20-24:6.) He and his codefendants "were maintaining contact with Abdi Nur, who by the end of May [2014] had reached Syria [and he and his codefendants] were receiving guidance and information and assistance from Abdi Nur as to how to get to Syria to join ISIL." (Plea T. 30:10-17.) He then made an attempt to travel to Syria through New York, though fortunately he was turned away at the airport. (PSR ¶¶ 56-57.) ISIS was able to convince Mr. Musse to attempt to give up everything he had – family, education, community, and work – to join them. Of course, Mr. Musse bears the ultimate responsibility for his decisions, but his responsibility should be understood in the context of how he was influenced and targeted by ISIS. (Koehler T. at 240:15-24) (agreeing that these terror organizations are very sophisticated in their recruiting and that they target young men and women like Mr. Musse and his co-defendants.)

Hanad has begun to realize what ISIS really is. This is one reason he pled guilty – and was the **first** in his indictment to do so. (PSR ¶ 2). This likely helped pave the way for other of his co-defendants to plead guilty. (PSR ¶ 3.)  Part of what spurred his mental change has been how long – over 18 months – he has had the ability to self-reflect away

from ISIS propaganda. Another part of it is who he has been able to interact with – for example, one of his cellmates was a Shia Muslim, and through long stretches of dialogue and debate, Mr. Musse learned to respect those views. This is a strong departure from ISIS's mandates.[7] He needs more exposure to positive, inclusive influences to help counteract ISIS's subversion. These positive influences are not readily available through the Bureau of Prisons. (*See* Koehler T. at 68:8-68:13.) ("I'm not aware that there's currently any prison-based counter-radicalization program in the federal U.S. prisons. There is definitely a lack of trained staff and experts in de-radicalization and countering radicalization in prison, and there's a lack of adequate facilities and protocols; [. . .]"). Instead, the best resources for fighting ISIS's influence are the specially-trained United States Probation Officers alongside positive support from the community-at-large. (*See* Koehler T. at 72:14-73:25; 281:7-282:7) (discussing the training provided by Mr. Koehler to the United States Probation Officers). A 72-month prison sentence is sufficient to punish his conduct and to also get Mr. Musse around the people who can help him continue his transformation back to the peaceful, caring son and brother he was before ISIS propaganda snared him.

### 2) The nature and circumstances of the offense and the history and characteristics of the defendant.

Mr. Musse notes many of the same factors which apply to his motion for a downward departure based on age apply here. Mr. Musse is young. The biological and

---

[7] ISIS believes Shiites are apostates, not real Muslims, and deserve death. In 2014 and 2015, ISIS fighters would capture groups of people, question them to attempt to discern whether they were Sunni or Shiite, and execute those who they believed were Shiites.

behavioral development of Mr. Musse will be significant between the time of his arrest at age 19 and the time when he is released from custody. The heightened maturity of judgment and lowered risk-taking behavior that continue to develop in Mr. Musse can bolster this Court confidence's in Mr. Musse's lawful behavior after he is released from custody.

Mr. Musse has changed since he was detained in early 2015. He is learning how to look at the world more realistically and critically. Changes like this cannot be completed overnight, and they are not linear. People slip and fall on their way to a better place. For example, Mr. Musse backslid during his interview with Mr. Koehler. He lied and minimized the "conspirational" nature of the group. This was wrong. But it was also understandable – he was afraid he and his family would be ostracized if he did something the community perceived as "snitching" only weeks before his codefendants' trial. The Twin Cities Somali community is particularly tight-knit and can be distrustful of government cooperators. To Mr. Musse's credit, after he thought about what happened, he recognized what he did was wrong, apologized to Mr. Koehler and the Court, and expressed a desire to tell the truth. This, like his guilty plea, shows a willingness to self-reflect and admit his mistakes. It shows he is someone who can change.

Mr. Musse is extremely grateful for the unwavering support of his family and the community. It has meant a lot to him to see how much everyone cares about him, and he wants him to close this chapter of his life and move on.

### 3) Need to protect public from further crimes of defendant and need to provide training

One obvious concern presented in sentencing in terrorism cases is future dangerousness. As to Mr. Musse, this Court can be confident he will not present a danger when released. Mr. Musse did not act violently during the commission of this offense. He did not advocate violence. He was not the emir (or leader) of the group. He did not discuss or plan terror acts on United States soil. He did not pledge allegiance to ISIS. He did not buy or possess any guns or explosives. He did not send money or equipment abroad to support ISIS. Further, Mr. Musse has a significant support structure, which includes his mother, father, aunts and uncles (some of whom he is especially close with), cousins, Imam, family friends, individual friends, and members of the community who have come out to support him and the other defendants during the trial. *See* Hanad Musse's Release Plan, previously disclosed to the Court. All of these people strongly oppose ISIS. The community here despises ISIS and the effects it has on the younger generation. The people close to Mr. Musse do not want him to join the organization – indeed when Mr. Musse's father became suspicious, he demanded his son not make any attempt to join ISIS. (*See* Plea agreement, contained in the PSR at ¶ 153.) All of these people will do what is needed to ensure Mr. Musse will not backslide.

While the imposition of the statutory maximum prison sentence might initially seem the safest course, it would actually risk further radicalization. (Koehler T.68:8-70:14) (discussing the lack of trained staff, expertise, adequate facilities, and adequate protocols in the BOP system, and noting time in prison as a "black box that [he] would

assess as a potential additional risk that raises the radicalization rate.").[8] When in the

Bureau of Prisons, there is no outside control over who he is exposed to, what kinds of

programming will be available, or even whether he is geographically isolated from his

support network.

Counteracting the effects of ISIS is work which requires care and experience.

Unfortunately, the reality is the Bureau of Prisons does not have that capacity. BOP

officers are not trained to manage the religious, political aspect, or social aspects of

counter radicalization. The Probation Officers who will monitor him on supervised

release are so trained. The more time Mr. Musse is in prison, the harder it will be to

permanently extinguish the effects of ISIS's propaganda.

### 4)  The need to avoid unwarranted sentencing disparities

A sentence of 72 months not only achieves the statutory goals of sentencing, it

does so without creating unwarranted sentencing disparities. Looking around the nation at

similar cases is difficult because of how factually different the prior defendants are. (Dkt.

No. 698.) Many went to trial, some (like Mr. Musse) pled guilty earlier, and others pled

guilty later. Many had specialized training, but Mr. Musse did not. Many had strong and

persistent ideals of committing violent acts at home, but Mr. Musse did not. Many

recruited others to join ISIS and helped facilitate their travel, but Mr. Musse did not.

Most were older than Mr. Musse. Conversely, some received USSG § 5K1.1 departures

for substantial assistance which Mr. Musse will not.

---

[8] Mr. Musse notes his further risk is mitigated by his lack of designation as an "emir"– a factor Mr. Koehler considered significant. (Koehler T. 131:12-132:3.)

A close examination of the terrorism cases throughout the United States shows two distinct logical groups – "recruiters" – individuals who radicalize others or help others to fight, versus "recruits" – individuals whose offense consists primarily of being (successfully) convinced to join an organization. Other factors equal, recruiters receive harsher sentences than recruits. In this classification, Mr. Musse is a "recruit." He recruited no one.

Comparing recently sentenced terrorism defendants shows a substantial range of sentences. A 72-month sentence would be in-step with this precedent. Most of the defendants who received higher sentences were more culpable than Mr. Musse in one of a variety of ways. Consider, for example:

- Mufid Elfgeeh, Western District of New York, 6:14-cr-6147. Elfgeeh was sentenced to 270 months imprisonment. He actively sought financial support for ISIS, advocated for ISIS on social media, and recruited others to join ISIS. He told two individuals he would connect them with a trustworthy ISIS contact after they traveled to Syria, he paid for one individual's birth certificate and passport, he connected one individual with an ISIL contact online, he raised money for one individual to buy a plane ticket, and he purchased firearms – with silencers – in cash.

- Muhammad Oda Dakhlalla, Northern District of Mississippi, 1:15-cr-98. Dakhlalla was recently sentenced to 96 months imprisonment, while his co-defendant and fiancée Jaelyn Deshaun Young was sentenced to 144 months imprisonment. Mr. Dakhlalla was 23 years old and Ms. Young was 20 years old. Part of the discrepancy between these sentences was that Ms. Young radicalized Mr. Dakhlalla, made plans to join ISIS, and then persuaded Mr. Dakhlalla to join those plans.

- Shannon Conley, District of Colorado, 1:14-cr-163. Conley was sentenced to 48 months imprisonment.  Ms. Conley was 19 years old when arrested. Dkt. No. 81 at p.78. Before being arrested, she was interviewed by FBI agents. She told those

agents she supported Jihad and believed it may be permissible to kill innocent civilians. She later met a Tunisian suitor online. That suitor was an active Al-Qaeda member who was fighting in Syria. Conley agreed to travel to join him and "joined the US Army Explorers (USAE) to be trained in US military tactics and firearms" and become a more proficient fighter. Plea Agreement, 14-cr-163, Dkt. No. 37 at p.8. She was arrested when she attempted to travel to Turkey while in possession of Anwar Al-Alaki DVDs and certificates of training. Note that Ms. Conley received a § 5K1.1 departure. Mr. Musse is not aware of the character or extent of her assistance.

- Mohammed Abdullah Warsame, 4-cr-29, 651 F. Supp. 2d 978 (D. Minn. 2009) (JRT). Warsame was sentenced to 92 months imprisonment on a single count of providing material support to Al-Qaeda. Warsame solicited others to send money to Al-Qaeda, trained at two terrorist training camps, and had access to Al-Qaeda's leadership. Further, as the government emphasized at sentencing, "In 2000 when he chose to go to Afghanistan to attend these camps, he was not a naïve, dreamy 19-year-old kid. He was a 27-year-old man[.]" Dkt. No. 179 at pp. 17-18.

- Ali Amin, Eastern District of Virginia, 1:15-cr-164. Amin's case demonstrates the extent to which recruiting others is an aggravating factor. Mr. Amin was sentenced to 136 months imprisonment despite the existence of numerous mitigating factors, including that Mr. Amin was extremely young (17 years old at sentencing), had significant health problems such as Crohn's disease, admitted his crimes during his first meeting with law enforcement, and met with law enforcement agents five times before he was arrested. After his arrest, he continued debriefing the United States government and continued cooperating. He formally denounced ISIS. Counterbalancing all those positive factors was his conduct, which is dramatically worse than Mr. Musse's:

> [Amin's] offense is notable both for its scope, reaching untold numbers of people worldwide, and for its acute impact on Reza Nikenjad and his family. On the one hand, it is hard to measure the impact on worldwide security the defendant has had [. . .] The only thing that is certain is that he was a prolific source for support, sophisticated advice, and facilitation to would-be ISIL members all over the world. On the other hand, it is hard to ignore the impact that the defendant's conduct has had on Reza Nikejad and his parents. This defendant radicalized Niknejad and set him on the path to violent jihad. [. . .]

> The defendant's conduct online and in person was well-considered, sophisticated, and calculated to provide support to ISIL[.]

Dkt. No. 15, at pp. 2-3. Mr. Musse's conduct is much less severe than Mr. Amin's and he consequently deserves a much lower sentence.

There are a variety of cases not discussed here where the sentencing courts imposed a variety of sentences. *See, e.g.*, Joseph Farrokh, Eastern District of Virginia, 1:16-cr-20 (102 months); Avis Brown and Akba Jordan, Eastern District of North Carolina, 5:14-cr-58 (92 months and 108 months); Nicholas Teausant, Eastern District of California, 2:14-cr-87 (144 months); Nader Elhuzayel, Central District of California, 8:15-cr-60 (360 months); and others.

No other defendant among those already sentenced is a perfect comparison to Mr. Musse, but it is clear Mr. Musse is among the least culpable of the national ISIS defendants. A sentence of 72 months is exactly the mid-point between Mr. Dakhlalla and Ms. Conley – two of the most comparable earlier defendants. Mr. Dakhlalla is similar in terms of offense conduct, as someone who wished to travel but did not appear to be particularly violent. Nevertheless, Mr. Musse deserves a lower sentence than Mr. Dakhlalla because (1) Mr. Dakhlalla was older than Mr. Musse at the time of the offense (23 years old) and thus likely more hardened in his views and harder to change, and (2) Mr. Dakhlalla's plans appeared to be more highly evolved and realistic than Mr. Musse's. As to Ms. Conley, Mr. Musse recognizes that she received a § 5K1.1 departure, and this is a substantial factor for sentencing courts. But he also respectfully notes serious aggravating factors present for Ms. Conley – that she was defiant and openly hostile to the United States, while Mr. Musse was not, and she was even willing to undertake

22

training to be a better fighter and servant for ISIS. This extended as far as "United States Army Explorers" training sponsored and provided by the United States Government. Mr. Musse submits that one reason a 72-month sentence would be reasonable is that it is at the midpoint of Mr. Dakhlalla's and Ms. Conley's sentences.

The appropriateness of a 72-month sentence is further validated by multiple critical mitigating factors present in Mr. Musse's case. First, he did not recruit or radicalize others. Unlike Ali Amin and Mufid Elfgeeh, Mr. Musse did not provide materials, advice, or assistance to drive people towards ISIS. He was recruited into his group and did not lead it as an "emir." Second, although he did not provide substantial assistance to the government through cooperation, he was the first of the defendants in his indictment to plead guilty – he led by positive example and showed a willingness to take responsibility for his actions (and probably helped motivate his co-defendants to also do so). Third, unlike someone like Ms. Conley, he did not undertake training to become a better fighter for ISIS (outside of playing paintball) before attempting to travel. This suggests he is less hardened in his views. Finally, unlike someone like Mohammed Warsame, Mr. Musse *was* a "naïve, dreamy, 19-year-old kid" who was seduced by the siren song of ISIS. These are strong mitigating factors.

## CONCLUSION

For the above-noted reasons, Mr. Musse respectfully requests the Court grant a downward variance and downward departure from the calculated guidelines range of 180 months and impose a sentence of 72 months. Such a sentence would strike the proper balance among the § 3553(a) factors and would vindicate the Court's sentencing power.

Mr. Musse is not without blame. But the plain fact is he was preyed upon by a sophisticated terror organization which targets immature young men. It does so **because** they are vulnerable. A 72-month sentence would be sufficient, but not greater than necessary, to effectuate the purposes of sentencing contained in 18 U.S.C. § 3553(a).

Respectfully submitted,

GASKINS BENNETT BIRRELL SCHUPP, LLP

Dated:  11-02-2016          s/ Andrew S. Birrell
Andrew S. Birrell (#133760)
Paul C. Dworak (#0391070)
Ian S. Birrell (#0396379)
333 South Seventh Street, Suite 3000
Minneapolis, MN 55402
(612) 333-9500

**ATTORNEYS FOR DEFENDANT HANAD MUSTAFE MUSSE**

EXHIBIT A

**Hanad Mustafe Musse**
**13880 Business Center Drive N.W**
**Elk River, Minnesota 55330**

October 20, 2016

Honorable Judge Michael Davis
300 South Fourth Street
13E U.S Courthouse
Minneapolis, Minnesota 55415

To the Honorable Judge Michael Davis:

I hope this letter reaches you in the best of health and faith. I hope by the end of this letter you will understand my intentions as well as my position today. I am the oldest amongst my siblings. My mother has taught me to be loving, sincere, and caring. My entire life I dedicated myself to taking care of my beloved family as well as others. I was living in Minnesota with my father my freshman year of high school and we motivated each other to be successful. I obtained a 3.8 GPA and was enrolled in many athletic programs at school.

During that time period, I relocated to Boston against my father's wishes because my mother gave birth to my little brother. Shortly after she was diagnosed with breast cancer. I left my father, friends, potential athletic future, and academic goals behind to go and help my mother who was in need of my support. While in Boston, my mother was undergoing intense chemotherapy. It was an awful experience for the both of us. There were times she couldn't feel her newborn child while holding him because of the numbness induced by the chemicals in her system. After these events, I spent long hours with my brother at night looking after his needs as an infant while during the daytime I was in school

1

trying to hold up my educational future.

After the hard, long year my mother fought cancer, by the grace of God, she became cancer free. I was planning to go to Minnesota and continue on with my future, but my mother needed further assistance because I was her oldest son and she needed my strength. My mother insisted on taking me to Africa with her, while my father disagreed saying that, "I am ruining my future going to Africa and my mother was doing just fine alone". The only reason that my father was opposed to me going to Africa is because he felt as if it was time for me to focus on my own life. While in Africa, I was at a disadvantage in the African culture due to being born in the United States. I was ridiculed, looked down upon and even outcast-ed at times  for my American ways. In time I adjusted to the ways of African culture while being extracted from my American identity.

I came back to America because I got home sick and sought to finish my high school education and go on to become a successful person so I could help my family, the way that all eldest sons should pursue to do in their lives. This was right after president Barack Obama got reelected for his second term; I was at the airport with an Obama graffiti t-shirt, happy to be home. Recalling these memories, I feel incredibly ashamed of my actions as it brings tears to my eyes. During my senior year, it took me awhile to enter high school because of credential problems. I had a lot of credits missing that I needed to finish high school. Many of my peers told me it was impossible to graduate during the prescribed time. I set out to accomplish this goal as well as trying to rekindle my relationship with my father. During the time that I was trying to obtain the needed amount of credits to graduate, I stumbled upon a video on Facebook of a young Syrian boy reciting poetry, condemning the government's atrocities. While the people were rallying around the boy, a barrel bomb dropped from a Syrian government warplane right in front of the crowd of people killing almost everyone. After the cameraman got up from the wreckage, all you could see were lifeless bodies as he searched for anyone who was alive. He saw the Syrian boy in his last seconds of life and he asked if the young boy was okay. All the boy could

2

utter was, " I will tell God what Bashar has done to me." This brought tears to my eyes as I wondered who could ever do this. I went on to do research that whole night. I saw another video of Syrian soldiers burying a man alive yelling at him, "Say that President Assad is your Lord." The man yells in return while his entire body is almost buried underground  "Allah is my Lord, there is no Lord but him." Another brutal thing I discovered that this Syrian Army was doing, was stripping the freedom of religion away from people. In the midst of my research, I saw some groups that were formed to protect the people. The ISIL group seemed appealing because I saw a video where after taking a city from the Syrian Government, I saw people running to the fighters kissing them on their faces and aid being passed out to the population as the whole city was being liberated. I compared their propaganda videos with that of other main factions and it seemed like ISIL was allied with all of the moderate rebels at the time. This was before the beheadings occurred and the oppression of ISIL became apparent, your Honor.

The main reason I was driven to go to Syria was to protect the Syrian people and give them the same values my country is giving me: freedom, protection, and opportunity. This whole time I was alone and didn't have anyone to share these feelings to besides my father who was working full time and mother who was in Africa. All the killings I saw by ISIL were reported to be enemy combatants, and never innocent people. I was stupid and blind to believe that. I lacked the knowledge and insight of their true intentions. The first time I attempted to leave was the hardest decision in my life. I convinced myself I was leaving for a good cause. I felt as if Syria was my home and it was my duty to protect its people after watching all the propaganda videos online. ISIL propagated that I was important to them, my life is sacred, and that I would have been a part of a government that would restore rights to the Muslims violated in Syria and stop all the wars, to go back to the golden ages of a Caliphate. After my experience in Africa, being treated like an American, and in America being treated like an African, I was never accepted to be a part of something. So I chased this dream that was presented to me. When

3

stopped by Federal Agents at the airport, reality hit me that I was doing something wrong. After coming back to Minnesota I was handed investigation papers on terrorism charges. This was the stage I began to feel alienated and the government started to follow me everywhere. It made me feel like an enemy of the state. My second attempt was merely because I was trying to run away from prosecution by the government because one of my co-defendants had already been arrested and I was worried that I would be next.

After pleading guilty I went to Anoka County Jail to become cellmates with a Shia Muslim. He became one of my dearest friends. We had many dialogues as he was an Iraqi immigrant. He told me many of his life experiences in Iraq, especially his encounters with ISIL when they were only in Iraq at the time. He encountered them in a highway that stretched into Syria that was called the "highway of death." While entering Iraq from Syria he and his friends used this main road. ISIL fighters stopped them and searched their car. The fighter asked them if they were Sunni or Shia and since my cellmate had a Sunni dialect he passed for a Sunni, however the others were Shia who had Shia dialects, which lead to a brutal slaughter of innocent people. He opened my eyes to many things that were happening there. He was a smart guy who helped with a lot in separating the lies from the truth. He always told me "you're a good Muslim brother who was hypnotized," and that I was not the enemy, I was the victim. This was one big step I took to understand ISIL's gruesome acts and fake propaganda, and it disappointed me that I lead myself to this road. I also ordered books by reporters in the dilemma of the Syrian crisis. This gave me more exposure to the true colors of events that ISIL was participating in. After leaving Anoka County Jail I was transported to Washington County Jail. In that county it was a lot easier to get reading material in. I increased my Islamic knowledge that I was lacking previously when I was fooled by these terrorists. Many of the rulings in the Islamic texts oppose the doctrine of ISIL. All of these things that came to light helped me see the truth and restored my conscious that had been

4

manipulated by the enemies propaganda.

Your Honor, I am against terrorism and I'm not a terrorist. ISIL propagated one who is called a "terrorist" is actually one who stands against oppression, who is not a coward to stand up for his rights. This is what I truly believed in the past. My belief has now changed because ISIL are cowards. They don't stand up for any rights, only their own interests. ISIL are truly terrorists. I was a victim of intense mental warfare that was used by the enemy.

In conclusion, I am truly sorry for my actions. I regret them more than anything I've ever done. They destroyed my life and now I am seeking to fix it. I understand the consequences that I face. I did wrong. I'm trying to move on, better myself, and get back with my family that I truly love. I plan to continue my education that I was pursuing before I got into this situation, I seek to marry and start my own family, and give back to the community that has been supportive of me during my incarceration. I ask the government, my family, and my community to forgive me and accept my apology. Thank you for you time.

Sincerely,

Hanad Mustafe Musse

_10/31/16_
Hanad Mustafe Musse
13880 Business Center Drive N.W
Elk River, Minnesota 55330

5