UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 15-49 (06) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | GOVERNMENT'S POSITION ON SENTENCING |
| HANAD MUSTOFE MUSSE (06), | |
| Defendant. | |

COMES NOW the United States of America, by and through its undersigned attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter, John Docherty, and Julie Allyn, Assistant United States Attorneys, submits the following position on sentencing. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of 15 years' imprisonment and a lifetime of supervised release is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I.    INTRODUCTION

Defendant Hanad Mustofe Musse has pled guilty to Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B.   The evidence in the case showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join,

and fight for, ISIL – one attempt in the Spring of 2014 which resulted in two travelers reaching Syria, while a third traveler was denied boarding at the airport by law enforcement; a second attempt, in the Fall of 2014, in which five travelers tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators tried to reach Syria via Mexico after driving to San Diego, California, to buy fake passports, then planned to use those fake passports to cross into Mexico, from where they would make their way to Syria. This third attempt was unsuccessful, and resulted in the arrest of six of this case's defendants.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the Report of Presentence Investigation prepared by the United States Probation Office. The evidence in this case shows that Defendant Hanad Musse was singularly committed to joining, fighting, and killing for ISIL from the inception of the conspiracy in the spring of 2014 until it was brought to an end by law enforcement's intervention on April 19, 2015.

Several men from Minnesota have died in Syria as a result of the conspiracy of which Defendant Musse was a part. Other men from Minnesota have reached Syria, and are active members of ISIL, a dangerous international terrorist organization which threatens the national security of the United States. The defendant lied to his family, he lied to the FBI, and, in self-serving interviews with the probation office and a deradicalization expert, he has continued to lie about his conduct and his motivations. To protect the public from the danger which the defendant poses, to provide just punishment,

2

and to deter others from joining foreign terrorist organizations, the 15-year sentence recommended by the government is appropriate.

## II.    THE FACTS OF THE CASE AGAINST DEFENDANT MUSSE

The evidence in this case shows that Hanad Musse was a committed member of the conspiracy from early in 2014 until his arrest on April 19, 2015.

### A. Defendant Musse's Role in the Spring 2014 Plot to Join ISIL

When the now-deceased Minnesota-based ISIL fighter Hanad Mohallim left the United States to join ISIL in March of 2014, he provided inspiration to Defendant Musse and others in the conspiracy.  After Mohallim's March 2014 departure[1], the defendant began attending meetings to discuss travel to Syria where he and his co-conspirators planned to join ISIL

Abdullahi Yusuf ("Yusuf") testified that in April in 2014, co-conspirator Guled Omar, then the *emir* of the group planning travel to join ISIL, gave Defendant Musse an ultimatum.  Yusuf recognized Omar's pitch to Musse as the same one he himself had received from Omar weeks earlier: "***you can join or you can walk away***."   As the three men sat outside the Dar al-Farooq mosque that Monday in mid-April, Musse opted in. *Yusuf 5/13/16, Tr. p. 105*.  The evidence revealed that from that point forward, Musse was steadfastly commitment to joining, fighting, and killing for the terrorist organization known as ISIL.

---

[1] Evidence in the record demonstrated that Mohallim traveled overseas with Douglas McCain, a/k/a "Tooth".  Originally from Minnesota, McCain was killed while fighting for ISIL in the summer of 2014.  Mohallim is believed to have been killed while fighting for ISIL in November of 2014.

Consistent with this choice, Defendant Musse used Facebook to show his admiration and respect for the radical Sheikh Anwar al-Awlaki.  The following was posted by the defendant on April 28, 2014:

> "*sheikh anwar is **the most intelligent guy I have seen so far** with my eyes he was killed because of he was speaking the truth of islam and the kuffars didn't like it he spoke about many things but was a high school scholar that was an American. …Last year the americans killed him because his wisdom was to strong and **he will eliminate the western movement** the kuffars are poisoning in the muslim youth and elderly today.*"

Defendant Musse would later discuss the impact that departures of Abdi Nur and Mohallim[2] had on them in the spring of 2014 and opined that Mohallim, *a/k/a Sayf*, helped spur them on to make their attempt to join ISIL.  In a 2015 recording, Defendant Musse expressed how he was particularly impressed by Mohallim, stating **"*Sayf is amazing.  He had good intentions.  So pure, bro.  He didn't tell no one.*"[3]**  Musse also revealed in the recording that he had fully intended to join ISIL in the early summer of 2014[4] and recalled how he had begged Omar, then his *Emir*, to give him the go-ahead to do so:

> "*Guled scared me bro you know.  **After Curry [Nur][5], exactly I was about to leave.  I told him, 'yo, give me the green go.'**  You know he was still emir, right?  He was the emir of all of us…**Told him 'yo, do I got the green go?***"[6]

---

[2] Hanad Mohallim departed Minneapolis for Syria in March of 2014 and Abdi Nur left in May of 2014.  Both men joined ISIL and are believed to have since been killed fighting for the terrorist organization.

[3] Trial Exhibits 237 (audio) and 238 (transcript, p. 32).

[4] See PSR, ¶ 95.

[5] It is believed that Nur has since been killed in Iraq or Syria while fighting for ISIL.

[6] Trial Exhibits 237 (audio) and 238 (transcript, p. 37).

Musse indeed would have been capable of leaving in the summer of 2014 as he was one of a few co-conspirators who had possession of a valid passport[7] that early in the conspiracy.

---

[7] Trial Exhibit 7 shows that Musse obtained his passport in late 2011.

### B. Defendant Musse's Involvement in the Conspiracy in the Summer of 2014

The defendant acknowledged in his guilty plea that throughout the summer of 2014, he attended meetings with his co-conspirators to discuss further the continued plots to join ISIL. Plea Agreement, ¶ 2, p. 2. Musse and the others also continued to share and consume ISIL propaganda posted on the internet.

On August 29, 2014, Musse would join his group of co-conspirators for a session of paintball, which others in the conspiracy would confirm was training for combat. PSR, ¶ 44. In September of 2014, Defendant Musse joined co-conspirators Daud, Mohamed Farah, Adnan Farah, Bashir, and Abdurahman working at a UPS mail processing facility through Doherty Staffing. PSR, ¶¶ 43, 193. The group got their jobs at Doherty for the sole purpose of earning money to finance their next attempt to join ISIL and the evidence showed that as they worked at the mail center, they both discussed plans to travel to Syria and consumed ISIL propaganda. *Bashir 5/19/16, Tr. ps. 61-65.* Co-conspirator Omar would later confirm on tape, "*[w]hen we were working at Doherty everything was going perfect…We were working, the kuffar were not, they didn't even know we worked together, they didn't even know nothing, bro.*"[8]

### C. Defendant Musse's Involvement in the Conspiracy During the Fall of 2014

For approximately two to three weeks during the fall of 2014, Defendants Musse, Daud, Adnan Farah, Mohamed Farah, Abdurahman, and Omar attended what they referred

---

[8] Trial Exhibits 203 (audio) and 204 (transcript, p. 125).

to as "tawheed meetings". Led by co-defendant Omar, the meetings were an opportunity for the conspirators to discuss the "oneness" of Islam, ISIL's latest propaganda videos, events in Syria, as well as novel methods of travel into Syria to join ISIL. *Bashir 5/19/16, Tr. ps. 68-69.*

In October of 2014, Defendant Musse appeared in a "Flipagram" video[9] produced and distributed by the younger brother of co-defendants Adnan and Mohamed Farah. The slideshow made up of photographs of many of the co-conspirators interspersed with pro-ISIL and pro-*jihadi* imagery and photographs of Minnesota-based al-Shabaab members – all backed by a soundtrack of ISIL *nasheeds[10]* – was a sample of homemade ISIL propaganda. Defendant Musse appeared numerous times in the Flipagram video, including one photograph depicted Musse sitting next to his co-conspirator Hamza Ahmed, who would join Musse weeks later as they attempted to travel to Syria by way of JFK.

Late in October of 2014, Musse and his co-conspirators settled on attempting to travel to Syria by way of New York's JFK International Airport. Having decided to use Jama's proven method to get out of the U.S. undetected[11], Musse made a series of five (5) cash withdrawals between October 20, 2014, and November 6, 2014, totaling $2,400, from his federal financial aid account. PSR, ¶ 68. The defendant deposited these funds into a personal checking account he opened at a Wells Fargo Bank on November 3, 2014. *Plea*

---

[9] Trial Exhibit 182.

[10] A '*nasheed*' is an *a cappella* musical chant. Jihadi nasheeds promote fighting and the importance of committing one's life to Islam. *See Lister 5/12/16, Tr. 115-16.*

[11] Co-conspirator Yusuf Jama had taken a bus from Minneapolis to New York's JFK International Airport to then fly overseas to join ISIL. Jama is believed to have been killed in Iraq or Syria some time later while fighting for ISIL.

*Agreement, ¶ 2, p. 3.* Musse and the three other JFK travelers were also given three contact numbers for ISIL fighters in Syria by their co-conspirator Omar.[12]

As the date for Musse's departure came closer, he and an unidentified Facebook friend engaged in debate about making *hijrah* for Allah. On October 27, 2014, Defendant Musse instructed his friend not to let college get in the way of his religion. When this friend downplayed the defendant's proselytizing, Musse responded by preaching the supposed rewards of traveling to Muslim lands to wage *jihad*:

> *"...Allah says make hijrah for the sake of this deen for me and I will reward you subhanallah if you leave a place for the sake of Allah swt n die wallahi they didn't describe the reward because it was so big but it was Jannah...we belong in Jannah so go home leave this dunya along meanwhile you're here full commit to Allah swt nothing else."*

When this unidentified Facebook friend pushed back on Musse's extreme interpretations, Musse insisted "*akhi [brother] the prophet sw said don't live close to a kafir[13] till you see not his light.*" His friend then rebuked Defendant Musse, stating *"you need to check your imam and your eyes."* Unrepentant, Defendant Musse replied, "*there isn't any excuse...I mean no one would come up with excuses and forgo the pleasure of Allah but Allah is all knowing and judges people on their various situation...Allah help us pass in all test in dunya and hereafter.*" One week after this exchange, Defendant Musse would join three of his co-conspirators in making his so-called *hijrah* to Syria by way of JFK International Airport.

---

[12] Omar stated, *"I give them the three numbers. I gave them Abdi's number. I gave them Abu Hud's number. And I gave them another brother's number, you know? Told them {put your trust in God.}* Trial Exhibits 197 (audio) and 198 (transcript, p. 30).
[13] 'Kafir' is a derogatory Arabic term for a non-believer.

### D. Defendant Musse Attempted to Join ISIL in November of 2014

Shortly after noon on November 6, 2014, Defendant Musse boarded a Greyhound bus leaving Minneapolis; the first of the 'JFK Four' to depart the Twin Cities. PSR, ¶ 55. On the same day that Musse bought his bus ticket, co-conspirator Omar attempted to fly from Minneapolis-St. Paul International Airport (MSP) to San Diego where Omar had planned to cross into Mexico then fly on to Syria. PSR, ¶ 54. Of note, Omar would later recount Musse's determination to reach Syria in November of 2014.

In a March 3, 2015, recording, Omar described calling Musse as Musse and the three other JFK-bound co-conspirators were travelling to New York City. Omar said that he had called Defendant Musse on MagicJack[14] to warn the JFK-bound co-conspirators that he [Omar] had been stopped at MSP by law enforcement and to plead with his co-conspirators to abort the attempt. Omar explained, *"...**the first thing I did when I got caught up is, I let them know. I called Hanad off of a different phone. I called him from a MagicJack number. I said, "Hanad, please don't go**, {I said.}[15]. Please don't do this right now, don't do this right now*." Omar recalled Musse's defiant response: "***Yo what the hell's your problem bro? You a punk man!***" [16]   Musse then hung up the phone and determinedly stayed the course, proceeding to New York City with Ahmed, Abdurahman and Mohamed Farah, despite Omar's counsel to turn back.

---

[14] "MagicJack" is a computer peripheral that allows the user to make unlimited calls in the U.S. and Canada over the internet. The device will also mask the originating phone number.
[15] Material in curved brackets has been translated into English from a foreign language, usually either Somali or Arabic.
[16] Exhibits 197 (recording) and 198 (transcript, p. 30).

Upon arrival in New York, Musse booked a room at a Times Square hotel for himself and his three co-defendants. The next day, November 8th, the four men proceeded to JFK where they searched online and booked their overseas flights. PSR, ¶ 56. Musse used his federal financial aid, now stored in his personal checking account, to purchase his plane ticket to Athens, Greece.  Before Musse was able to board, however, he was stopped and interviewed by law enforcement agents.  The ensuing interview was straight out of the conspiracy playbook:  Musse lied to the agents, telling them he intended to vacation alone in Athens for four days before returning to the United States, he expressed frustration at not being allowed to travel, and, as recommended by Omar, Musse accused the FBI of racial and religious profiling.  Musse denied involvement in any terrorist organization and asserted that he had never spoken poorly about the United States. PSR, ¶ 59.

At the conclusion of the interview, Musse was allowed to leave.  He returned to Minnesota by bus and when he arrived in St. Paul, FBI agents gave him a target letter from the United States Attorney's Office.  Several days later on November 12, 2014, Musse's father was interviewed by the FBI about his son's attempted travel.  During this interview, his father described receiving a phone call from Musse explaining that he was in trouble with the FBI but insisting that he was merely attempting to vacation in Greece.  During the agents' November 12th meeting with Musse's father, they used a copy of target letter to explain to him just how serious the matter was involving his son.  Musse's father expressed confusion, denied knowledge of the defendant's activities, and insisted that his son was vacationing from college alone in Greece.

Only when the agents showed the college calendar demonstrating that Musse was *not* on break from school during the JFK attempt, did his father acknowledge the suspicious nature of his son's attempted overseas travel.  He assured agents that he would speak with his son, promising the agents that his son would never travel again without his knowledge or permission.  He further told the agents that he planned to bring the defendant to meet with the FBI about this situation.  Agents, however, never heard from Musse or his father in this regard.

### E.  Defendant Musse Continued in the Spring of 2015 to Conspire to Join ISIL

Despite this intervention by the FBI in November of 2014 and despite the fact that his family was now aware of his criminal intentions, Defendant Musse did little except plan for another attempt to leave the U.S. to join ISIL.   Shortly after the JFK Four were stopped by law enforcement, the group of conspirators – including Musse – met at the Dar al Farooq Como mosque in Minneapolis to discuss the status of their criminal efforts.  The group discussed how they were sent back from JFKIA, what they should have done (e.g. split up the foursome with two leaving from Milwaukee and two from Boston), and what to do going forward – to include avoiding social media.  *Bashir 5/19/16, Tr. ps. 113-14.*

Around this time, Defendant Musse and others viewed the new ISIL propaganda video titled "*Although the Disbelievers Dislike It*".   *Bashir 5/19/16, Tr. ps. 122-23;* PSR ¶ 83.  This video[17] depicts ISIL fighters engaged in heavy combat, using knives to behead unarmed prisoners, summarily executing dozens of prisoners at gunpoint, the use of IEDs

---

[17] Trial Exhibit 186.

to attack ISIL's enemies, and, at the close of the video, a clip of "Jihadi John" warning the U.S. to prepare for war as he stands over the severed head of former U.S. service member Peter Kassig.  Notably, this video does not depict humanitarian relief provided by ISIL members.  Musse also continued to post radical messages on his Facebook page.  In December of 2014, one month after his failed JFK attempt, Musse posted the following message:

> "…*I love you all for the sake of allah* **I want to see you all in jannah**[18] *inshallah but how can this happen if we continue to disobey Allah and turn away from our deen*?"

On January 7, 2015, Musse updated his Facebook page with another message portending his next attempt to join ISIL: "***Big things going to happen soon.***"

With the use of his passport to fly now too risky, but with his determination to join ISIL unabated, Musse participated in the scheme to obtain fake passports to facilitate another attempt to join the terrorist organization.   In February of 2015, Defendant Musse was recorded in a discussion with co-defendants Omar and Abdurahman about their failed November of 2014 attempt.  Defendant Musse observed that within the group of four going to New York, they had no *emir* and that instead "*we hyped each other*."  Musse also lamented the fact that had he left from Milwaukee instead of JFK, he likely would have likely succeeded in making it to Syria.[19]  Musse, Abdurahman, and Omar further speculated

---

[18] 'Jannah' is Arabic for heaven.
[19] Trial Exhibits 189 (audio) and 190 (transcript, p. 15).

who amongst their group of co-conspirators were, at the time of the November 2014 attempt, on the government's "*terrorist organization watch list*".[20]

Based upon intelligence they obtained directly from ISIL fighters overseas, from watching countless ISIL propaganda videos and the news, and from the application of common sense, the defendant and his co-conspirators knew what to expect once they made it to Syria or Iraq. That is, these men expected be on the battlefields of Iraq and Syria fighting and killing on behalf of ISIL in its quest to create a so-called caliphate.

On April 6, 2014, Musse's co-defendant, Adnan Farah, gave Bashir passport photographs of both Musse[21] and Abdurahman to facilitate the preparation of fake passports.[22] Later that same day, Defendants Musse and Abdurahman met Bashir to discuss the pending plot to travel to Syria using those fake passports. During this meeting, Musse examined a photograph of a sample fake passport that Bashir had on his cell phone.[23] Musse admired the handiwork and compared it to his own real passport, noting that both contained seventeen digits and a similar barcode.[24]

During this meeting, Musse and Abdurahman questioned Bashir about the passport forger in California; an inquiry designed to alleviate Abdurahman's apparent suspicions about the reliability of this person. Defendant Musse demanded to know "*exactly word for word*" what Bashir and the passport forger talked about.[25] Bashir assured Musse and

---

[20] *Id*.
[21] Trial Exhibit 236.
[22] Adnan Farah Plea Agreement, p. 4 and TT, p. 20, of Bashir from 5/23/16.
[23] Trial Exhibit 183 is the photograph of the sample passport from Bashir's cell phone.
[24] Trial Exhibits 237 (audio) and 238 (transcript, ps. 1-2).
[25] Trial Exhibits 237 (audio) and 238 (transcript, p. 10).

Abdurahman the he had explained all of their circumstances to the forger:  "*[I] told him the situation.  What's going on.  Like eight niggers...trying to be out*."  To this Musse inquired, **"*[a]nd you said that they're terrorists?*"**  In this same conversation, Defendant Musse then proposed killing the passport forger if it turned out that he was working for the government:

| | |
|---|---|
| **MUSSE**: | ***I have a question.*** |
| CHS: | *The heck.* |
| **MUSSE**: | ***{If it gets tight on us,} I want that nigger to be killed bro, asap.*** |
| CHS: | *Damn nigger obviously.  Why would it be {tight?}* |
| **MUSSE**: | ***As in like if that guy is a {kuffar} as in like {if he works with those guys.}*** |
| CHS: | *Hell no nigger.* |
| **MUSSE**: | ***You—you won't even suspect it right?*** |
| CHS: | *Yeah.  No, he's not bro.  I would suspect that shit my nigger. That nigger ain't no freakin....They ain't got that shit in no police force my nigger, how he looked... Bro I know these Mexicans.* |
| **MUSSE**: | ***They look dirty right?*** |

Defendants Musse and Abdurahman further talked about the urgent need to get out of the country due to the then-recent arrest of their co-conspirator, Hamza Ahmed.[26]  Musse surmised that the window of opportunity to make another attempt would promptly shut if Ahmed decided to cooperate with the government: "***[i]f [Ahmed] gives a deal right now we'd probably get locked up the next day.***"[27]  Musse then encouraged Bashir to tell his

---

[26] Hamza Ahmed was arrested on federal charges relating to the JFK Four's attempt to fly out of New York.  His arrest on the federal complaint occurred on February 2, 2015.

[27] Trial Exhibits 237 (audio) and 238 (transcript, p. 10).

California-based cousin[28] that "*there's more [aspiring Minnesota jihadists] coming, they're just afraid…that these three niggers want to do it right now and they don't care what consequences come with it… if I get locked up for this one bro [praise be to Allah]. I tried my best.  You know I have no problem with it, facing the consequences.  Facing the music.*"[29]

During this same recorded conversation, Defendant Musse and Abdurahman also discussed the departures of co-conspirators Nur and Mohallim, noting the impact those departures had on members of the conspiracy.  Musse and Abdurahman opined that Mohallim, *a/k/a Sayf*, had a particularly significant impact on their desire to make the attempt to join ISIL.   Defendant Musse admired Mohallim's resolve and operational security, stating **"*Sayf is amazing.  He had good intentions.  So pure, bro.  He didn't tell no one.*"[30]**

During this April 6, 2015 conversation, Defendant Musse also revealed his willingness to commit crimes in order to fund his travel to join ISIL: "*I know how to get my three grand bro.  {I'm gonna go rob people.}  I'm gonna say, I have to go hustle people*."[31]  The defendant also explained his willingness to look and behave "moderately" as a means by which to confuse law enforcement or anyone else who might try to stop him from joining the terrorist organization.   Defendant Musse said he would go to the "*same*

---

[28] As part of his cooperation, Bashir represented to the defendants that he met the passport forger through a cousin who lived in California.
[29] Trial Exhibits 237 (audio) and 238 (transcript, p. 18).
[30] Trial Exhibits 237 (audio) and 238 (transcript, p. 32).
[31] *Id.* At p. 56.

*extent*" that co-conspirator Mohamed Roble, a/k/a "*Rose*"[32] did in order to make it out of the country, echoing Roble's and Daud's mantra that they would "***fake it until you make it***."[33]

The evidence established that shortly after the events and conversations of April 6, 2015, Defendant Musse's family learned of this latest plan to travel overseas with the co-conspirators.  This prompted Musse to get his passport photograph back from Bashir.  *Plea Agreement, ps. 4-5*.   Defendant Musse did not, however, withdraw from the conspiracy; rather, he took actions to preserve the viability of his own and his co-conspirator's future travel to Syria.  *Id.*  After taking his passport photo back, Defendant Musse met with co-conspirators Abdurahman and Mohamed Farah on April 9th to discuss the on-going plot to join ISIL.  Defendant Musse was angry because his father had learned from the Farah's mother that "*these boys were trying to leave.*"  *Bashir 5/23/16, Tr. p. 26.*   Concerned that he would be revealed as a plotter and that any future chance at joining ISIL might be compromised, Musse warned his co-defendant Mohamed Farah:  "***don't link it to me…Simple as that.***"[34]  Musse also counseled his fellow defendants on what type of phone to use (an Android device) and how to behave once they had left the U.S. ("***I'm just saying the best thing is to disperse at the same time***").[35]

---

[32] "Rose" is Musse's co-conspirator who traveled to China in the fall of 2014, then into Syria in December of 2014 where he joined ISIL.  *See* PSR ¶ 84.  Roble has been charged by complaint with providing and conspiring to provide material support to ISIL.  *See United v. Mohamed Amiin Ali Roble, 16-CR-00037-001.*
[33] Trial Exhibits 237 (audio) and 238 (transcript, p. 62).
[34] Trial Exhibits 241 (audio) and 242 (transcript, p. 39).
[35] Trial Exhibits 241 (audio) and 242 (transcript, p. 42).

Indicative of his continued desire to join ISIL, Defendant Musse advocated pressing on with their attempts to join ISIL – particularly if Ahmed was not cooperating with authorities: ***"[b]ecause if Hamza's not speaking bro that means we have a good time for us to work this all out and complete the mission and go on***."[36]   Musse calculated that the passport forger in San Diego could "*hold our stuff*" and suggested that they "*let him keep it somewhere*."   Confident of his continued ability to join ISIL, Defendant Musse stated that he wanted his future fake passport to make him a Canadian citizen.[37]

### F. Defendant Musse Makes Multiple False Statements Post-Plea

"*I understand that I might've given off the notion that I was being dishonest, but that isn't the case at all*."  Defendant Musse, August 3, 2016 letter to Daniel Koehler

After his arrest on April 19, 2015, Defendant Musse negotiated a plea agreement with the government.  Musse appeared before this court on September 9, 2015, at which time he entered a plea of guilty to conspiring to provide material support to ISIL and provided a thorough factual basis for that offense.  In April of 2016, Musse provided a statement to the Court's deradicalization expert, Daniel Koehler.  In summary, Musse lied to Koehler about numerous aspects of his involvement in the conspiracy and he attempted to portray his interest in ISIL as motivated by humanitarian concerns.  Many of Musse's statements to Koehler directly contradicted his sworn testimony at the time of his guilty plea.   For example, the defendant further claimed that he *never* discussed travel to Syria with his co-conspirators and he denied being a member of any group conspiring to join

---

[36] Trial Exhibits 241 (audio) and 242 (transcript, p. 43).
[37] Trial Exhibits 241 (audio) and 242 (transcript, p. 71).

ISIL.  Musse also told Koehler that ISIL appealed to his "*caring personality*."  He claimed that, at the beginning, his desire to join ISIL was not religiously motivated.  Though he has not denied the elements of the crime to which he has pled guilty, Musse has endeavored to minimize his involvement in a way that the evidence simply does not support.  In these post-plea statements, Musse, like many of his co-conspirators, absurdly cast his participation in the conspiracy in terms of a humanitarian mission gone astray.  He, like other defendants in this case, ultimately attempt to assign nobility to his criminal intent where it ought not belong.

Months after the aforementioned interview with Mr. Koehler, Musse would write Koehler and this Court asking for another chance to speak with the expert.  In his letter dated August 3, 2016, to Koeher, Musse acknowledged that he "*wasn't completely forthcoming*" to Mr. Koehler; explaining that he "*didn't want to implicate or do [] harm to my co-defendants*" who were, at the time, proceeding to trial.  Musse also blamed his conduct, in part, on the frustration experienced by "*my girlfriend leaving*."  In a further attempt to minimize the lies he told Koehler, Musse said in the letter, "*I understand that I might've given off the notion that I was being dishonest, but that isn't the case at all*."

Musse would then write this Court on August 26, 2016, to make the request for a second chance with Mr. Koehler.  In this letter, Musse claimed that he didn't want to hurt his friends who were going to trial – even though he was assured that the information he provided to Koehler would not be used against those defendants.  Notably, both of these requests by Defendant Musse for a second opportunity with Koehler occurred only after

the three co-defendants were convicted by the jury in June of 2016 and no further harm could be done to his fellow aspiring terrorists.

### III.   THE REPORT OF PRESENTENCE INVESTIGATION

#### A. Factual Statements in the PSR

The United States has no objections to the factual assertions in the PSR.

#### B. Sentencing Guidelines Calculations in the PSR

The PSR calculates a base offense level of 26.  The United States concurs that the terrorism adjustment of U.S.S.G. § 3A1.4 applies, resulting in a 12 level increase in offense level and a criminal history of Category VI.  Consistent with the plea agreement in this matter, the United States is not seeking application of a two-level increase for obstruction of justice under Section 3C1.1.   The PSR calculates a total offense level of 37 with a criminal history category of VI.  The parties contemplated a total offense level of 35 with a criminal history category of VI.   The 2-level adjustment for obstruction of justice has no practical effect because whether or not the increase is applied, the guidelines sentence remains 180 months given the statutory maximum sentence of 15 years for the offense of conviction.

### IV.   THE COURT SHOULD SENTENCE THE DEFENDANT TO IMPRISONMENT FOR FIFTEEN YEARS.

> *If I get locked up for this one bro [praise be to Allah].  I tried my best. You know I have no problem with it, facing the consequences.  Facing the music.* – Defendant Musse, April 6, 2015

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines

range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.   552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.")

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented."  *Id.* at 50. If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.*  Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."   18 U.S.C. § 3553(a).

## A.  Nature and Circumstances of the Offense

The nature and circumstances of the offense are set forth in detail in Common Appendix A.  The defendant stands convicted of conspiring to provide material support to the designated foreign terrorist organization known as ISIL.  The organization he sought to assist is one of the most dangerous and violent in existence.  ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Antwerp, Nice, and

San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.

Throughout the 2014 and into 2015, Musse engaged in a single-minded pursuit of travel to join this criminal organization.  Despite the intervention of the FBI, despite the arrests of two of his co-conspirators, despite receiving a target letter from a federal prosecutor, despite his family's knowledge of his intentions, despite the deaths of co-conspirators in battle overseas, despite knowledge that he would be incarcerated for a lengthy period of time, and despite Musse knowing that he would take up arms against other Muslims and kill them – most likely in a most inhumane fashion – he chose to pursue terrorism.

As has been discussed in this sentencing position paper, the loss of life in this conspiracy, both among conspirators who have been killed and innocent victims of terrorist acts, has been immense.  The threat to the national security of the United States has been grave.  The seriousness of the defendant's criminality is a reason for a lengthy term of imprisonment in this case.  *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

### B.  History and Characteristics of the Defendant

As the facts set forth, Defendant Musse is one of eleven men who conspired to join ISIL.  He is 21 years old and was born in St. Louis Park, Minnesota.  He attended public schools here and he has no criminal record. Despite this benign posture, Musse endeavored to join a terrorist organization the likes of which the world has not encountered before in terms of its ability and willingness to inflict death and destruction and in the calculated promotion to the world of its violent acts.

21

Not only did his well-documented actions reveal his commitment to terrorism, but his words were often chilling as well.  Musse adopted the mantra, "*fake it till you make it*" and by doing so, challenges this Court to decide whether anything he does following his guilty plea represents authentic repentance and de-radicalization, or whether it is simply a facade designed to lull the "*kuffar*" into believing the defendant has moved past his radical ideology.  Unfortunately, only time will tell which of these propositions is correct.

What this Court *does* know is what Defendant Musse has done and what Musse has said in differing contexts.  For example, when he didn't know anyone other than his co-conspirators were listening, Musse suggested killing the undercover agent who posed as the passport forger.  After his guilty plea, Musse lied repeatedly to a de-radicalization expert to protect himself and his co-conspirators.  During his participation in the conspiracy, Musse said he is willing to commit crimes here in the U.S. in order to achieve his goal of joining ISIL. And Musse took educational assistance offered by his government and used it to try to join a criminal terrorist organization.  These examples of Musse's actions and words speak volumes about who he is, how his mind works, and what the appropriate punishment should be.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The defendant stands convicted of an extremely serious crime. Considering the seriousness of this crime, promoting respect for the law and providing just punishment are important factors in this case.  As the Supreme Court has recognized, "combating terrorism

is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S. Ct. 2705, 2724 (2010).

Further, although the defendant is a young man with no criminal history, Musse's participation in this conspiracy to provide material support to ISIL cannot be viewed as a discrete event, borne out of a rash or youthful impulse.   The defendant took a series of deliberate steps to provide "material support"; that is, he offered his own self in the service of a deadly criminal terrorist organization and did so while fully aware of the potential consequences for his actions. The defendant was heard on tape stating, "***if I get locked up for this one bro [praise be to Allah].  I tried my best.  You know I have no problem with it, facing the consequences.  Facing the music."***  These undisputed facts indicate that a fifteen-year term of imprisonment is necessary to reflect the seriousness of the defendant's crime and to promote respect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant

In this case, there is a need for both individual and general deterrence. Individual deterrence discourages a defendant from ever committing such a crime again.   General deterrence is necessary to deter other people from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)).

Not too long ago, Minnesota suffered a wave of young men traveling to join *al Shabaab*, and presumably many of those young men are now dead.  Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists.  As the Court witnessed in the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant community support.  General deterrence is necessary to impress upon the greater community that no matter your age, religion, or politics, trying to become a terrorist has serious, dire consequences.  A substantial sentence is necessary to deter individuals, like the defendant, from supporting international terrorism.  As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project* at 2725.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of the defendant, was laid out in the Introduction at the beginning of this pleading.  Terrorism, being motivated by fanaticism, is uniquely difficult to deter.  An effort must nevertheless be made.  However, if deterrence should be unavailing, then a fifteen-year sentence is amply justified as a means of incapacitating the defendant.

Undoubtedly, the most important objective of any government is the physical safety of the people.  Physical safety is the necessary precondition to the exercise of all other

rights, such as freedom of expression, of religion, and of the press, to name only a few. Defendant Musse's plan to join ISIL in June of 2014, his November 8, 2014 attempt to travel overseas to Syria, and his participation in all aspects of this conspiracy, including his desire to protect his co-conspirators even after his guilty plea make Musse a dangerous individual and less susceptible to real rehabilitation.  A fifteen-year sentence will, if nothing else, incapacitate the defendant for fifteen years during which time it will be impossible for him to hurt anyone else.  Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a substantial term of imprisonment would send a clear message to any would-be jihadists that such conduct is not tolerated by the U.S. government.

### E.  The Kinds of Sentences Available, the Need to Avoid Disparities, and the Sentencing Guidelines and Related Policy Statements

As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is no counter-radicalization programming offered by the Bureau of Prisons.  This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change during his term of imprisonment, the government will of course not stand in the way of defendant Musse receiving any programming that will reduce the risk he currently represents to the safety of the public.

The United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization.  *See*, Docket No. 698.  A review of the sentences imposed is telling.  Of twenty defendants, in fourteen cases where

convicted of an 18 U.S.C. § 2339B violation, fourteen of those defendants, or nearly three-quarters, were sentenced to the statutory maximum term of 15 years' imprisonment. Only four of these convictions followed trial; the rest were all the result of guilty pleas. In short, courts are imposing the maximum sentences allowed by law in 2339B cases, even when defendants have admitted to their wrongdoing and initiated the rehabilitative process by pleading guilty. The sentence of fifteen years' imprisonment, requested by the government, is consistent with the national sentencing pattern in similar cases. The government is requesting like sentences for those defendants before this Court who pled guilty to the same crime, but have not offered assistance to the government.

## V.    CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence defendant Hanad Musse to a term of imprisonment of fifteen years, followed by supervised release for the rest of his life.

Dated: November 3, 2016            Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Andrew R. Winter*
BY: ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 232531

JULIE E. ALLYN
Assistant United States Attorney
Attorney ID No. 256511

JOHN DOCHERTY
Assistant United States Attorney
Attorney Reg. No. 017516X

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad.  Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years.  Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution.  The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police.  The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.   President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.    U.S.

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support.  The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building.  The United States then withdrew its diplomats from Syria.  The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition.  For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies.  Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I. THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A. Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization.  Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda.  With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan.  In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

5

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

7

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state.  Second, ISIL used its extreme brutality as a recruiting tool.  To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam.  To publicize its brutal acts, ISIL has proven very savvy at using electronic media.  As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history.  At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought.  As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset.  The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time.  In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days.  So

it's a core tenet, it's a core principle of ISIL's belief. And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise. I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God. So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties. Of note, the battle of Kobani pitted ISIL against Kurdish militia. At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.    THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL. There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul.  However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation.  In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day.  Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization.  The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents.  They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur).  In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial.  Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria.  In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL.  Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.